*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF KINZIE RENEE CARLSEN, by
MINDY CARLSEN and ALLEN CARLSON,
Personal Representatives,

        Plaintiffs-Appellants/Cross-Appellees,

v

SOUTHWESTERN MICHIGAN EMERGENCY
SERVICES, PC,

        Defendant-Appellee/Cross-Appellant,

and

BRONSON METHODIST HOSPITAL, ERIN K.
EFEREM, and RYAN S. SMITH,

        Defendants.

FOR PUBLICATION
September 2, 2021
9:05 a.m.

No. 351159
Kalamazoo Circuit Court
LC No. 2013-000353-NH

Before: TUKEL, P.J., and K. F. KELLY and GADOLA, JJ.

TUKEL, P.J.

This professional negligence action arises from the June 30, 2012 death of seven-month-old Kinzie Renee Carlsen at Bronson Methodist Hospital (Bronson). Plaintiffs Mindy Carlsen and Allen Carlsen, as personal representatives of the Estate of Kinzie Renee Carlsen, appeal by right from the trial court's orders denying their motion for a new trial and granting defendant Southwestern Michigan Emergency Services, PC's (Southwestern), motion for taxed costs. Plaintiffs also appeal the trial court's order entering a judgment on the jury's verdict of no cause of action. On appeal, plaintiffs raise a *Batson*[1] challenge, assert several instances of prejudicial misconduct on the part of Southwestern's counsel, and challenge the amount of taxed costs

---

[1] *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), as modified by *Powers v Ohio*, 499 US 400; 111 S Ct 1364; 113 L Ed 2d 411 (1991).

-1-

awarded to Southwestern. On cross-appeal, Southwestern challenges the trial court's order granting plaintiffs' motion to approve payment of costs. Southwestern asserts that it was entitled to recover its taxed costs from the Estate's settlement with Bronson Methodist Hospital before plaintiffs' attorney recovered his costs and fees. We affirm the trial court's orders entering a judgment of no cause of action, denying plaintiffs a new trial, and granting plaintiffs' motion for payment of costs. In addition, we affirm, in general, the trial court's award of taxable costs to Southwestern, but reverse the amount of taxable costs awarded and remand for further proceedings consistent with this opinion.

## I. UNDERLYING FACTS

Just before 6:00 p.m. on June 27, 2012, Kinzie presented to the emergency department at Bronson Methodist Hospital in Kalamazoo. She had a fever of 104.6 degrees Fahrenheit, a pulse of 180, and a respiratory rate of 28. According to her medical chart, she was examined by second-year resident Dr. Erin K. Eferem and Dr. Eferem's supervising physician, Dr. Ryan S. Smith. According to Kinzie's chart, she was active with a strong cry; her ears, nose, mouth, and throat were normal; the whites of her eyes were normal; and her pupils were equal, round, and reactive to light. She was alert and displayed normal strength and muscle tone, her anterior fontanelle was flat, and her neck was supple with a normal range of motion. A urinalysis showed an elevated level of proteins but no sign of infection, and she had no diaper rash. She was given Motrin and Tylenol for her fever and discharged at 8:45 p.m., by which time her temperature had decreased to 100.7 degrees Fahrenheit. It was recommended that her parents bring Kinzie back to the hospital or follow up with her pediatrician in a few days.

The next day, June 28, Kinzie's father, Allen, noticed a lump on the side of Kinzie's neck that had not been there before. He took her to Bronson LakeView Hospital in Paw Paw, where they were told that Kinzie had meningitis. Kinzie was intubated, given 900 milligrams of intramuscular Rocephin—an antibiotic—and transferred by "baby bus" to Bronson in Kalamazoo; at some point, she was put on a life support machine. Two days later, tests showed no brain activity. Life support was withdrawn, and Kinzie was pronounced dead at 11:25 a.m. on June 30, 2012. Kinzie's death certificate identifies her cause of her death as "Staphylococcal Sepsis and Meningitis."

Kinzie's parents, as personal representatives of Kinzie's estate, filed a professional negligence claim against Drs. Eferem and Smith, alleging that Bronson Methodist Hospital and Southwestern were vicariously liable for the acts and omissions of Drs. Eferem and Smith.[2] The complaint alleged that the standard of care for an emergency-medicine physician confronted with a patient that presented with Kinzie's signs and symptoms required the physician to formulate a differential diagnosis that included bacterial infection, order the diagnostic tests necessary to confirm or eliminate that diagnosis, diagnose and treat a bacterial infection, keep the child in the hospital for monitoring, and consult with experts in pediatrics or infectious diseases. Drs. Eferem

---

[2] Southwestern is a corporation that runs Bronson's emergency room.

and Smith were professionally negligent for failing to comply with this standard of care, and their negligence proximately caused plaintiffs' injuries and damages.

In February 2015, the parties stipulated to the dismissal of Dr. Eferem with prejudice and to the dismissal with prejudice of claims against Bronson arising from Dr. Eferem's conduct. In May 2018, plaintiffs and Bronson entered into a confidential settlement agreement. Plaintiffs affirmed that they understood that costs incurred by their attorney's firm as well as their attorney fees would be deducted from the settlement funds. The remainder would go to the estate to be distributed by the trial court. The trial court entered an order approving the agreement.[3] About the same time as the agreement to settle, the parties stipulated to dismiss Dr. Smith from the action without prejudice. Plaintiffs proceeded to trial against Southwestern.

Plaintiffs' expert witnesses at trial were Dr. Joseph Cervia, Dr. Karen Jubanyik, and Dr. Carolyn Crawford. Drs. Cervia and Crawford testified that, although Kinzie was in the early stages of meningitis when she presented to Bronson on June 27, there was a window of opportunity for effective treatment. Dr. Cervia explained that Kinzie had an overwhelming bacterial infection caused by methicillin-resistant staph aureus (MRSA). Dr. Cervia stated that, although MRSA are resistant to the antibiotics typically used to treat staph infections, there are antibiotics that still work on the organism, and Vancomycin was the drug of choice used to treat MRSA. All three of plaintiffs' experts testified that if doctors had administered the antibiotic Vancomycin to Kinzie on June 27, she would have survived. Dr. Jubanyik testified that Dr. Smith's failure to administer Vancomycin breached the standard of care for an emergency-medicine doctor.

Southwestern's expert witnesses were Dr. Francis McGeorge and Dr. David Talan. Dr. McGeorge testified that Drs. Eferem and Smith complied with the standard of care: they did exactly what he would have done, what he would have trained any resident to do, and what he would have expected any colleague to do. He explained that even if the doctors had administered antibiotics to Kinzie on June 27, the standard treatment that all doctors do is to administer the antibiotics Rocephin and/or Amoxicillin, neither of which is effective against MRSA. In essence, the defense experts testified, nothing that the standard of care called for the doctors to do for Kinzie on June 27 would have changed the outcome. Dr. Talan confirmed that the evaluation of Kinzie met the standard of care, and that there was nothing in textbooks or the guidelines regarding how to treat MRSA infections that would have led the doctors to administer Vancomycin. Dr. Talan also opined that the MRSA that Kinzie's father had in his toe differed from the bacteria that caused Kinzie's death.[4]

---

[3] The settlement order prevented "disclosure of the terms of the settlement to any person other than the parties, their attorneys, and appropriate court officials." As such, we will not address the settlement's terms here.

[4] While providing Kinzie's medical history, Allen told Dr. Eferem that he recently injured his toe and had been treated at the local emergency room with antibiotics. After examining the toe and discussing her evaluation with Dr. Smith, Dr. Eferem concluded that Allen had an unidentified bacterial infection. She prescribed Keflex, an antibiotic. The parties disputed whether Kinzie

-3-

The jury returned a five-to-two verdict of no cause of action. After several posttrial motions were resolved, plaintiffs appealed and Southwestern filed a cross-appeal.

## II. *BATSON* CHALLENGE

Plaintiffs first contend that defense counsel erroneously exercised a peremptory strike to exclude a juror on the basis of race and sex, in violation of the United States and Michigan Constitutions, and that the only remedy for the error is to vacate the jury's verdict and remand the matter for a new trial. We find no *Batson* violation.

### A. STANDARD OF REVIEW

When reviewing a *Batson* challenge,

> the proper standard of review depends on which *Batson* step is before us. If the first step is at issue (whether the opponent of the challenge has satisfied his burden of demonstrating a prima facie case of discrimination), we review the trial court's underlying factual findings for clear error, and we review questions of law de novo. If *Batson*'s second step is implicated (whether the proponent of the peremptory challenge articulates a race-neutral explanation as a matter of law), we review the proffered explanation de novo. Finally, if the third step is at issue (the trial court's determinations whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination), we review the trial court's ruling for clear error. [*People v Knight*, 473 Mich 324, 345; 701 NW2d 715 (2005).]

A trial court's finding "is clearly erroneous when no evidence supports the finding or, on the entire record, this Court is left with a definite and firm conviction that a mistake has been made." *King v Mich State Police Dep't*, 303 Mich App 162, 185; 841 NW2d 914 (2013).

### B. ANALYSIS

"A *Batson* error occurs when a juror is actually dismissed on the basis of race or gender." *People v Bell*, 473 Mich 275, 293; 702 NW2d 128 (2005). To establish a *Batson* violation, the opponent of a peremptory challenge must first establish a prima facie showing of discrimination. This requires showing that:

> (1) he [or she] is a member of a cognizable racial group; (2) the proponent has exercised a peremptory challenge to exclude a member of a certain racial group from the jury pool; and (3) all the relevant circumstances raise an inference that the

---

contracted an infection from the toe, and whether Drs. Eferem and Smith were negligent by failing to, in the words of plaintiffs' attorney, put "two and two together" and treat Kinzie with antibiotics.

proponent of the challenge excluded the prospective juror on the basis of race. [*Knight*, 473 Mich at 336.]

"[I]f the trial court determines that a prima facie showing has been made, the burden shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike." *Id*. at 337. The race-neutral explanation for the strike "need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 US at 97. Indeed, "*Batson*'s second step does not demand articulation of a persuasive reason, or even a plausible one; 'so long as the reason is not inherently discriminatory, it suffices.' " *People v Tennille*, 315 Mich App 51, 63; 888 NW2d 278 (2016), quoting *Rice v Collins*, 546 US 333, 338; 126 S Ct 969;163 L Ed 2d 824 (2006). "Finally, if the proponent provides a race-neutral explanation as a matter of law, the trial court must then determine whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination." *Knight*, 473 Mich at 337-338. At this third stage, a trial court's finding will turn largely on an assessment of credibility; therefore, "a reviewing court ordinarily should give those findings great deference." *Batson*, 476 US at 98 n 21.

The United States Supreme Court held in *JEB v Alabama ex rel TB*, 511 US 127, 130-131; 114 S Ct 1419; 128 L Ed 2d 89 (1994), that intentional discrimination on the basis of gender violated the Equal Protection Clause, US Const, Am XIV, "particularly where . . . the discrimination serve[d] to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women." The Court explained that "[p]arties still may remove jurors who they feel might be less acceptable than others on the panel; gender simply may not serve as a proxy for bias. . . . Even strikes based on characteristics that are disproportionately associated with one gender could be appropriate, absent a showing of pretext." *Id*. at 143. The Supreme Court noted, for example, that "challenging all persons who have had military experience would disproportionately affect men at this time, while challenging all persons employed as nurses would disproportionately affect women. Without a showing of pretext, however, these challenges may well not be unconstitutional, since they are not gender or race based." *Id*. at 143 n 16.

In the present case, plaintiffs' attorney raised a *Batson* challenge during voir dire when defense counsel used a peremptory challenge to exclude Juror 5(c)—a pregnant, African-American woman—from the jury. Juror 5(c) was the third juror to fill seat five, the first having been dismissed for cause, and the second having been struck by Southwestern. When asked by the trial court if there was anything it should be aware of regarding her suitability to serve as a juror in this case, Juror 5(c) answered that she was $6\frac{1}{2}$ months pregnant, and stated, "Emotions, you know, all that stuff." The attorneys' subsequent questions revealed that Juror5(c) had just graduated from college with a degree in financial planning and anticipated attending graduate school to study accounting. She believed that she would be able to evaluate the case on the basis of the facts and the evidence, not on sympathy, and she said that, when making decisions, she leaned more toward logic than toward passion and emotion. Defense counsel exercised a peremptory strike to excuse Juror 5(c).

Plaintiffs' counsel requested a bench conference and immediately raised a *Batson* challenge, stating that Juror 5(c) was the only "African American on that panel." Defense counsel replied: "It's really simple. . . . She's pregnant." Plaintiffs' counsel argued that, although pregnancy was race-neutral, excluding Juror 5(c) because she was pregnant was nonetheless

discriminatory because pregnancy was a proxy for sex. Defense counsel explained that he liked Juror 5(c)'s answers during voir dire, but this case was about the death of a seven-month-old child, thus suggesting that the facts of the case would be particularly disturbing or stressful to Juror 5(c), who was expecting her own child. Defense counsel said that he would have the same concern of a male sitting on the jury whose wife was expecting. After the parties had argued their respective positions, the trial court determined that defense counsel's reason for peremptorily challenge Juror 5(c) was not inherently discriminatory and allowed the challenge to go forward.

The record in the present case supports the trial court's finding that the reason offered by defense counsel for excusing Juror 5(c) from the jury was not inherently discriminatory. Parties may "remove jurors who they feel might be less acceptable than others on the panel" as long as their reasons for doing so are not proxies for race or gender bias. See *id*. at 143. This case involved the tragic death of a seven-month-old baby. The questions that defense counsel asked during voir dire show that he was trying to impanel a jury that would put aside emotions when deciding the case. He asked at least seven potential jurors—male and female—whether they made decisions based more on emotion or on logic. Furthermore, defense counsel exercised only two peremptory challenges, both of which were used on jurors who admitted to varying degrees that emotions might affect their deliberations: Juror 5(b), who said that she was not sure she could focus on the facts of the case because she was a very sympathetic person, described herself at one point as "insanely sympathetic," and characterized herself as tending to base decisions more on passion than on logic; and Juror 5(c). Defense counsel's exercise of peremptory strikes does not show a pattern of striking jurors on the basis of their gender—by our estimation, three or four of the impaneled jurors were women—but on counsel's estimation of whether there were any indications that a juror, for whatever reason, might not view the facts of the case with the level of dispassion desired by the defense.[5]

Because defense counsel's reason for peremptorily challenging Juror 5(c) was not inherently discriminatory, it survives plaintiffs' *Batson* challenge. See *Tennille*, 315 Mich App at 63 (holding that, at the second step of a *Batson* challenge, a race-neutral reason need not be persuasive or plausible; "so long as the reason is not inherently discriminatory, it suffices") (quotation marks and citations omitted). Accordingly, the trial court did not err by determining that Southwestern's peremptory challenge was not race- or sex-based, and by allowing the challenge to go forward. Because there was no *Batson* error, the trial court did not abuse its discretion by denying plaintiffs' motion for a new trial on the basis of this issue.

### III. VIOLATION OF MRE 408

Plaintiffs next contend that defense counsel gratuitously and improperly revealed plaintiffs' settlement with Bronson in violation of MRE 408 and a prior order of the trial court, and that counsel's comment so prejudiced them that a new trial was warranted. We disagree.

---

[5] The record is unclear regarding whether there were three or four female jurors when voir dire concluded. Either way, the number of female jurors clearly did not establish a pattern of defense counsel making a concerted effort to exclude females from the jury.

## A. STANDARD OF REVIEW

This Court reviews a trial court's decision on a motion for a new trial and evidentiary decisions for an abuse of discretion. *Zaremba Equip Inc v Harco Nat'l Ins Co*, 302 Mich App 7, 21; 837 NW2d 686 (2013). "An abuse of discretion occurs when the decision resulted in an outcome falling outside the range of principled outcomes." *Hayford v Hayford*, 279 Mich App 324, 325; 760 NW2d 503 (2008). "An error of law necessarily constitutes an abuse of discretion." *Denton v Dep't of Treasury*, 317 Mich App 303, 314; 894 NW2d 694 (2016). "[A]n abuse of discretion will normally not be found when addressing a close evidentiary question." *Pena v Ingham Co Rd Comm*, 255 Mich App 299, 303; 660 NW2d 351 (2003). Additionally, this court reviews the interpretation of court rules de novo. *Lamkin v Engram*, 295 Mich App 701, 707; 815 NW2d 793 (2012). Finally, "[t]his Court reviews a trial court's findings of fact for clear error." *Kuhlgert v Mich State Univ*, 328 Mich App 357, 368; 937 NW2d 716 (2019).

## B. ANALYSIS

Plaintiffs argue that they are entitled to a new trial because defense counsel violated MRE 408 by stating that Bronson was dismissed from the case. MRE 408 provides, in relevant part:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

During trial, plaintiffs' counsel asked Dr. Jubanyik about Kinzie's vital signs taken at Bronson. During this line of questioning, Dr. Jubanyik testified that Kinzie's blood pressure had not been recorded, she would expect to see a blood pressure test under the circumstances, and "if the nurse didn't do it (inaudible) a physician's job to request." Defense counsel objected on the basis that there had been no claim that it was a violation of the standard of care to not tell the nurse that she should take Kinzie's blood pressure, there was no claim that any nurse did anything wrong in this case, and "the hospital's been dismissed from it."

Plaintiffs' counsel immediately asked for a bench conference and, at the conference, asked for the jury to be excused. After the jury was excused, plaintiffs' counsel asserted that telling the jury that Bronson was dismissed was error and he asked the trial court to tell the jury that Bronson had not been dismissed. Rather than inform the jury that Bronson had not been dismissed (which it in fact had been), the trial court told the jury that Bronson and plaintiffs had reached an agreement and settled their dispute, Bronson was not present as a defendant, and the only defendant was Southwestern. The trial court deemed the explanation both necessary and appropriate, given that the case had repeatedly been called as "Carlsen versus Bronson Methodist Hospital" in the jury's presence.

Southwestern's comment that "the hospital's been dismissed" did not violate MRE 408. Defense counsel's observation that Bronson had been dismissed was accurate and, on its face, was not a statement about the existence or terms of a settlement—the hospital could have been

"dismissed" by stipulation or through summary disposition—or about any conduct related to the settlement. For the same reasons, the statement did not violate the trial court's prohibition against "disclosure of the terms of the settlement to any person other than the parties, their attorneys, and appropriate court officials." There simply is no merit to plaintiffs' allegation that the hospital's comment violated either MRE 408 or the trial court's order. Plaintiffs assert that *Brewer v Payless Stations, Inc*, 412 Mich 673; 316 NW2d 702 (1982) and *Kueppers v Chrysler Corp Inc*, 108 Mich App 192; 310 NW2d 327 (1981),[6] support their entitlement to a new trial. But both cases involved situations in which the trial court concluded that the jury could learn details of settlement amounts. *Brewer*, 412 Mich at 674-675; *Kueppers*, 108 Mich App at 197-198, 203; *Brewer v Payless Stations, Inc*, 94 Mich App 281, 283-284; 288 NW2d 352 (1979), aff'd 412 Mich 673; 316 NW2d 702 (1982).[7] The trial court in the present case did not admit evidence of settlement amounts. Consequently, *Kueppers* and *Brewer* are of no help to plaintiffs.

Plaintiffs contend that they suffered prejudice from defense counsel's comment and the trial court's explanation to the jury that Bronson and plaintiffs had reached a settlement. Specifically, plaintiffs point to two questions submitted by the jury to the trial court as evidence that the jury was preoccupied with the settlement.[8] Rather than explain how these questions show that the Bronson settlement influenced the jury's assessment of the case against Southwestern, plaintiffs have essentially announced their position and left it to this Court to discover and rationalize the basis for its claim. As such, the issue is abandoned. See *Cheesman v Williams*, 311 Mich App 147, 161; 874 NW2d 385 (2015) ("An appellant may not merely announce a position then leave it to this Court to discover and rationalize the basis for the appellant's claims; nor may an appellant give an issue only cursory treatment with little or no citation of authority.").

We conclude that defense counsel's statement that "the hospital's been dismissed" did not violate MRE 408 or the trial court's order prohibiting disclosure of the terms of the settlement. The trial court's explanation to the jury that Bronson and plaintiffs had settled their dispute and that Bronson was no longer a party to the litigation was accurate, reasonable, and arguably necessary given how the case had been called during the first three days of trial. Plaintiffs have not identified any prejudice from either defense counsel's comment or the trial court's explanation.

---

[6] "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority." *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012) (citation omitted).

[7] We cite this Court's opinion in *Brewer* because it was referenced by our Supreme Court's opinion in *Brewer* and provides additional facts not addressed by our Supreme Court's opinion.

[8] The questions were: (1) "Who were the nurses employed by? SWM[E]S v Bronson."; and (2) "Were the nurses or the Resident legally prevented from testifying on behalf of the defense due to the settlement with Bronson? If not, why are there no character witnesses for the doctor?" The trial court's answer to the first question was "Bronson," and it responded that the second question was irrelevant to the proceedings.

For these reasons, the trial court did not abuse its discretion by denying plaintiffs' motion for a new trial on the basis of defense counsel's comment.

## IV. ATTORNEY MISCONDUCT

Plaintiffs next assert that defense counsel made multiple comments designed to incite the jury's passion and prejudice against plaintiffs' counsel, which resulted in a verdict premised on bias and prejudice rather than reasonable deliberation and, therefore, requires this Court to vacate the jury verdict and remand for a new trial. We disagree.

## A. STANDARD OF REVIEW

Claims of attorney misconduct are subject to harmless error review. *Reetz v Kinsman Marine Transit Co,* 416 Mich 97, 102-103, 330 NW2d 638 (1982). "An attorney's comments do not normally constitute grounds for reversal unless they reflect a deliberate attempt to deprive the opposing party of a fair and impartial proceeding." *Id.* Reversal is required only when "the prejudicial statements reveal a deliberate attempt to inflame or otherwise prejudice the jury, or to deflect the jury's attention from the issues involved." *Zaremba Equip*, 302 Mich App at 21 (quotation marks and citation omitted). Additionally, as explained earlier, this Court reviews a trial court's denial of a motion for new trial for an abuse of discretion. *Id.*

## B. ANALYSIS

A trial court may grant a new trial when the misconduct of the prevailing party materially affected the substantial rights of the nonprevailing party. MCR 2.611(A)(1)(b). In *Reetz*, 416 Mich at 102-103, our Supreme Court provided the following framework for analyzing claims of improper attorney conduct:

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action.

Plaintiffs moved for a new trial in part on the basis that defense counsel's comments were attacks on plaintiffs' counsel and intended to prejudice the jury. In rejecting this argument, the trial court noted that this case was a "contentious" proceeding and that the attorneys had been "very strong in their advocacy . . . very forceful in their—their arguments." The trial court opined that their "zealous advocacy" was within "the bounds of . . . good lawyering . . . within the context of a trial." The trial court further stated that its prior order limiting plaintiffs' causes of action to

what they had asserted in their complaint had occasioned many objections from both parties, but opined that counsels' conduct, although perhaps displaying their frustrations with each other, did not create an atmosphere of intimidation for the jury or taint the trial.

Our review of the record convinces us that the trial court's observations about the attorneys' conduct during the trial were fair and accurate. The parties fiercely disputed the condition Kinzie was in when she arrived at Bronson on the evening of June 27; whether she was properly examined and treated there; and whether antibiotics could have saved her life; counsel even disputed the significance of facts upon which they agreed, such as Kinzie's vital signs. Some of defense counsel's objections arose from a "hyper sensitivity," as the trial court described it, to any indication that plaintiffs' counsel was trying to introduce new theories of negligence. Viewing these objections in the context of the entire record makes clear that their purpose was not to distract the jury, but to keep it focused on the relevant issues.

Plaintiffs claim that defense counsel made several impermissible speaking objections, i.e., objections that contain "more information than the judge needs to rule on the objection," and "are often intended to influence the jury or the witness." *Zaremba Equip*, 302 Mich App at 21 n 3. Plaintiffs take exception to defense counsel's statement that he wanted to "admonish Counsel and instruct the jury of two things . . ." and they object to defense counsel's comment made while examining Dr. Talan that Mindy's deposition testimony amounted a recalled memory from "a person filing a lawsuit, seeking to get money, right" portraying them as avaricious and money-grubbing. In our view, none of defense counsel's objections appear to have been designed to attack plaintiffs' attorney or to distract, inflame, or prejudice the jury. Rather, they typify what the trial court referred to as the attorneys' frustrations with one another. Regarding defense counsel's observation about money, as Southwestern points out in its brief to this Court, plaintiffs' attorney stated during opening statement that plaintiffs were there "for one reason and one reason only . . .money [because Southwestern didn't] want to pay." Plaintiff's attorney then emphasized this comment by stating that in America, "justice equals money." If plaintiffs' attorney's references to money implied a quest for justice, it seems incongruous for plaintiffs to claim that defense counsel's reference to money impugns their motives and paints them as avaricious. Moreover, that all occurred in the context of a lawsuit, and juries are certainly well-aware that the point of a lawsuit is for the plaintiff to recover money and for the defendant to avoid having to pay. Given that, the comments had a limited ability to inflame the jury, as they did not convey any information of which the jury otherwise would have been unaware.

We conclude that the trial court was correct that the attorneys' zealous advocacy for their clients was within the bounds of good lawyering within the context of a trial. None of defense counsel's comments rise to the level of comments that warrant a new trial. See, e.g., *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 290-91; 602 NW2d 854 (1999) (among other improprieties, the attorney repeatedly and baselessly accused the opposing parties and their witnesses of covering up their malpractice through conspiracy, collusion, perjury, fabrication, and the destruction, alteration, and suppression of evidence, and insinuated that the defendants were motivated by money and greed to cover up their alleged malpractice). On this record, we cannot conclude that defense counsel's comments were improper. The record simply does not support plaintiffs' assertion that defense counsel's comments were unfairly prejudicial or designed to distract the jury from the issues at hand. Accordingly, we conclude that the trial court did not

-10-

abuse its discretion by denying plaintiffs' motion for a new trial on the basis of defense counsel's alleged misconduct.

## V.  SOUTHWESTERN'S TAXED COSTS

Plaintiffs next raise several challenges to the amount of prevailing-party costs that the trial court awarded Southwestern.  Specifically, plaintiffs assert that Southwestern is not entitled to the $2,350 claimed for taking the depositions of Drs. Jubanyik and Crawford and the $15,387.50 in expert fees for Dr. William Barson.  In addition, plaintiffs argue that an evidentiary hearing is necessary to determine the bases and reasonableness of the $68,321.47 in expert fees awarded for Dr. Talan, and the $50,676.99 in expert fees awarded for Dr. McGeorge.  We agree in part.

## A.  STANDARD OF REVIEW

This Court reviews a trial court's award of taxable costs under MCR 2.625 for an abuse of discretion.  *Klinke v Mitsubishi Motors Corp*, 219 Mich App 500, 518; 556 NW2d 528 (1996).  This Court also reviews for an abuse of discretion "the proper amount of taxable expert witness fees," *Guerrero v Smith*, 280 Mich App 647, 675; 761 NW2d 723 (2008), as well as a trial court's decision that an evidentiary hearing is not warranted, *Kernen v Homestead Dev Co*, 252 Mich App 689, 691; 653 NW2d 634 (2002).  Whether a particular expense is taxable as a cost is a question of law that this Court reviews de novo.  *Guerrero*, 280 Mich App at 670.

## B.  ANALYSIS

"Costs will be allowed to the prevailing party in an action, unless prohibited by statute or by [court] rules or unless the court directs otherwise, for reasons stated in writing and filed in the action."  MCR 2.625(A)(1).  "The power to tax costs is purely statutory, and the prevailing party cannot recover such expenses absent statutory authority."  *Guerrero*, 280 Mich App at 670.  "Costs" or "taxable costs" are not the equivalent of "expenses."  *Id*.  " 'While "expenses" is used by the Michigan Court Rules in its generic sense, i.e., the reasonable charges, costs, and expenses incurred by the party directly relating to the litigation, "costs" or "taxable costs" are strictly defined by statute, and the term is not as broad . . . .' "  *Beach v State Farm Mut Auto Ins Co*, 216 Mich App 612, 621; 550 NW2d 580 (1996) (citation omitted; alteration in original).  Accordingly, the presumption that costs shall be allowed as a matter of course to the prevailing party "does not mean . . . that every expense incurred by the prevailing party in connection with the proceeding may be recovered against the opposing party."  *Id*. at 622 (citation omitted).  Rather, "[t]he term 'costs' as used [in] MCR 2.625(A) takes its content from the statutory provisions defining what items are taxable as costs."  *Id*. (second alteration in original).

### 1.  EXPERT FEES FOR DRS. CRAWFORD AND JUBANYIK

Plaintiffs object to the $2,350 taxed for the depositions of Drs. Crawford and Jubanyik.  We disagree.

Plaintiffs argue that the trial court taxed $2,350 for the deposition transcripts of the depositions of Drs. Crawford and Jubanyik.  But the record shows that the cost was not assessed for transcripts; rather, the cost was for the doctors' time spent being deposed.  MCR

2.302(B)(4)(a)(*ii*) authorizes a party to "take the deposition of a person whom the other party expects to call as an expert witness at trial." As explained by this Court in *Kernen*, 252 Mich App at 692,

> MCR 2.302(B)(4)(c)(i) requires the trial court to direct the party obtaining deposition testimony from an expert to pay the expert a reasonable fee, unless a manifest injustice would result from the payment. Similarly, unless a manifest injustice would occur, MCR 2.302(B)(4)(c)(ii) also requires the trial court to direct an opposing party to pay a reasonable portion of the expenses incurred by a party in obtaining discoverable information from a retained expert who is not expected to testify at trial. In its discretion, the trial court may, but is not obligated to, require reimbursement for other discovery obtained by a party from the expert of the opposing party.

Additionally, the court rule "does not require that the deposition testimony of the expert be used at trial before the trial court may award fees under the rule." *Id*. at 693. It is indisputable that the $2,350 at issue was for the deposition time of Drs. Crawford and Jubanyik, and plaintiffs do not dispute that the doctors are entitled to a reasonable fee for time spent at a deposition, or that it is improper to tax an expert's reasonable fee for deposition time as a cost. Thus, the trial court did not err by awarding as taxable costs $2,350 for the deposition time of Drs. Crawford and Jubanyik.

## 2. EXPERT FEES FOR DR. BARSON

Plaintiffs object to the $15,387.50 taxed for Dr. Barson's trial preparation, arguing that no costs should be taxed because, three years before trial, Southwestern voluntarily chose to not use Dr. Barson as a witness. We agree.

Plaintiffs argue that Dr. Barson was "never anticipated or called to testify at trial." This is not an accurate statement of the record. The record clearly establishes that Dr. Barson was listed as a potential expert witness on defense witness lists filed in February 2014. The record, however, also shows that by the spring of 2016, Southwestern had decided not to use Dr. Barson as an expert witness at trial and that Dr. Barson's final invoice for a service rendered is dated May 2016. That Southwestern essentially discharged Dr. Barson three years before trial raises the question of the statutory authority to tax his fees as costs. The trial court determined that Dr. Barson's fees were taxable because Southwestern's decision not to use Dr. Barson as an expert "[did] not diminish the fact that it was a cost associated with employing that individual at some point." The trial court is correct that Southwestern incurred costs associated with employing Dr. Barson as an expert witness, but the question we must answer is whether plaintiffs must pay those costs as taxed costs even though Southwestern voluntarily chose, long before trial, to not use Dr. Barson as an expert witness. Consequently, Dr. Barson never testified, either by deposition or at trial.

MCL 600.2164(1), a subsection of the statute dealing with expert witness fees, states in pertinent part:

> No expert witness shall be paid, or receive as compensation in any given case for his services as such, a sum in excess of the ordinary witness fees provided by law, unless the court before whom such witness is to appear, or has appeared,

-12-

awards a larger sum, which sum may be taxed as a part of the taxable costs in the case.

The question presented here is whether the phrase "is to appear" applies to a witness who was not deposed and did not testify at trial even though the case went to trial and resulted in a final verdict. For the reasons explained here, we conclude that it does not. Instead, the phrase "to appear" applies to witnesses who could have been called to testify at some point, either by deposition or through trial testimony. The phrase "to appear" does not refer to the situation which took place here, in which a case proceeded to trial and verdict but the witness gave neither deposition nor trial testimony, notwithstanding language in other cases which could be read as authorizing witness fees under such circumstances.

> "[I]t is well settled that, regardless of whether the expert testifies, the prevailing party may recover fees for trial preparation." *Peterson v Fertel*, 283 Mich App 232, 241; 770 NW2d 47 (2009).

> The language "is to appear" in MCL 600.2164 applies to the situation at bar in which the case was dismissed before defendant had a chance to call its proposed expert witnesses at trial. Furthermore, the trial court was empowered in its discretion to authorize expert witness fees which included preparation fees. [*Id.*, quoting *Herrera v Levine*, 176 Mich App 350, 357-358; 439 NW2d 378 (1989) (brackets omitted).]

Expert witness fees for trial preparation are compensable because

> It is not amiss to observe generally that few expert witnesses could testify properly or effectively without careful preparation and, on occasion, without necessary disbursement in the course of such preparation. For instance any medical or legal expert, testifying without preparation and confronted by a cross-examiner of competence, would find little comfort in the witness box. More important, his testimony would provide but little light for the trier or triers of fact. [*Id.* at 241-242, quoting *State Hwy Comm'r v Rowe*, 372 Mich 341, 343; 126 NW2d 702 (1964).]

This Court has repeatedly interpreted MCL 600.2164(1) to allow the prevailing party to tax costs for an expert's trial preparation, even if the case did not proceed to trial, provided that the witness would have testified if there had been a trial. See, e.g., *Home-Owners Ins Co v Andriacchi* 320 Mich App 52, 72-73; 903 NW2d 197 (2017) (holding that "a party may recover expert fees under MCL 600.2164 where a case is dismissed before that expert can testify at trial"); *Peterson*, 283 Mich App at 241 (case dismissed at summary disposition phase; taxing costs for defendants' expert witnesses who did not testify at deposition or trial was permitted because witness would have testified if case had continued); *Herrera v Levine*, 176 Mich App 350, 357-358; 439 NW2d 378 (1989) (taxing costs for defendants' expert witnesses who did not testify at a deposition or at trial because the case was dismissed at the summary disposition stage).

In each of the cases cited, however, the reason that the prevailing party's expert witness did not testify was due to the case having been summarily dismissed before the witness was called

upon to testify, either by deposition or for trial. The present case is distinguishable from these cases due to the fact that it was not a pretrial dismissal which obviated the need for Dr. Barson's testimony, but because Southwestern decided more than three years before the trial not to use him as an expert witness. Interpreting the phrase "to appear" to include an expert whom the party who hired the expert has determined, long before trial will, will not be a witness, conflicts with this Court's prior interpretation and application of MCL 600.2164's phrase "to appear" as applying in situations in which a case is dismissed before a defendant has "a chance to call its proposed expert witnesses at trial." *Herrera*, 176 Mich App at 357. Plaintiff had every chance to call Dr. Barson at a deposition long before trial, but decided, for whatever reason, not to obtain his testimony. As a result, Dr. Barson simply did not "appear" as a witness, and Southwestern had no need to prepare his testimony.

Prior to trial, a party's proposed expert witness certainly qualifies as a witness who could be called "to appear" at some point in the future. But that is no longer so after the proceedings have concluded. At that point, all potential witnesses either have appeared or not. Consequently, if a case goes to trial and reaches a final verdict then a trial court may tax costs only for those witnesses who actually appeared, either through deposition, or trial testimony, or both, or who would have appeared had the case not been dismissed before trial. Applied to the circumstances of this case, no statutory authority supported the trial court's order taxing costs for Dr. Barson's expert witness fees. Consequently, we reverse the portion of the trial court's order taxing costs for Dr. Barson's expert witness fees.

### 3. EXPERT FEES FOR DRS. TALAN AND MCGEORGE

Plaintiffs also contend that an evidentiary hearing was necessary to evaluate the basis for, and the reasonableness of, the costs awarded for Drs. Talan and McGeorge. We agree.

As this Court explained in *Van Elslander v Thomas Sebold & Assoc, Inc*, 297 Mich App 204, 218; 823 NW2d 843 (2012):

> An expert is not automatically entitled to compensation for all services rendered. Conferences with counsel for purposes such as educating counsel about expert appraisals, strategy sessions, and critical assessment of the opposing party's position are not regarded as properly compensable as expert witness fees. Experts are properly compensated for court time and the time required to prepare for their testimony. In addition, the traveling expenses of witnesses may be taxed as costs, MCL 600.2405(1); MCL 600.2552(1); MCL 600.2552(5). [Brackets, quotation marks, and citations omitted.]

When the record is insufficient to enable this Court "to discern the actual hours expended for taxable costs of court time from that attributable to conference and meeting time, which would not necessarily be a taxable cost," the remedy is a remand "for an evidentiary hearing to further distinguish and recalculate those hours spent on taxable versus nontaxable costs." *Id*. at 219 (citation omitted).

Plaintiffs complain that Drs. Talan and McGeorge did not provide sufficient detail in their invoices to show how much time was spent on particular tasks. The record shows that, in six years,

Dr. McGeorge submitted three invoices. The first was dated May 7, 2018, and stated that from June 2013 until the date of the invoice, he had "logged 61.5 hours in review of material, discussions with you [Southwestern's attorney] and your associates, as well as travel on this matter." Dr. McGeorge stated that his review "include[d] but was not limited to review of initial and subsequent medical records, discussions with attorneys, preparation for deposition and trial twice (requiring re-review of file), and review of depositions [listed]." At $400 an hour, the total charge was $24,600.

Dr. McGeorge's second invoice was dated June 17, 2019, and stated that, since May 2018, he had "logged 43 hours in review of materials, discussions with you and your associates, as well as travel to Kalamazoo and expenses on this matter." His review included but was not limited to "review of initial and subsequent medical records, discussion with attorneys, review of literature, preparation for trial (requiring re-review of file), and review of depositions from" the same people listed in the May 2018 invoice, as well as Dr. McGeorge reviewing his own prior deposition testimony in the case. At Dr. McGeorge's new rate of $450 an hour, he billed Southwestern $19,350.

The final invoice was dated June 17, 2019. It stated that Dr. McGeorge had logged eight hours of trial appearances, which he billed at his trial rate of $500 an hour. In addition, he charged $2,475 "for expenses related to trial, travel, and accommodations." The total charged on the invoice was $6,475. None of the invoices establish whether Dr. McGeorge provided receipts to document charges for the expenses he claimed. On each invoice, Dr. McGeorge offered to make available more detailed billing information if required. Nevertheless, defense counsel explained at the hearing on Southwestern's motion for taxed costs that Dr. McGeorge was not required to provide additional detail: counsel submitted the invoices to the insurance carrier, and the carrier paid.

Southwestern argues on appeal that the trial court did not abuse its discretion by denying plaintiffs' request for an evidentiary hearing because "the parties briefed the issue and the court had ample information to assess the reasonableness of [Southwestern's] costs." But, with respect to the costs taxed for Dr. McGeorge's services, the trial court did not have sufficient information to determine whether all of the expenses incurred for Dr. McGeorge's services were taxable as costs. Costs are taxable for Dr. McGeorge's court time, preparation time, and travel expenses. See *Van Elslander*, 297 Mich App at 218. But, in addition to these tasks, Dr. McGeorge's invoices also stated that he had "discussions with attorneys." The invoices are not sufficient to allow the trial court, or this Court, to determine whether these discussions are taxable because they were for trial preparation, or are not taxable because they were for "educating counsel about expert appraisals, strategy sessions, and critical assessment of the opposing party's position." See *id*. Consequently, we remand to the trial court "for an evidentiary hearing to further distinguish and recalculate those hours spent on taxable versus nontaxable costs." See *id*. at 219.

Regarding the trial court taxing Dr. Talan's fees as costs, what stands out to us is $17,000 in "trial testimony cancellation fees" and an additional $17,000 in what appear to be combined travel-time and trial testimony fees. Compensation for travel and trial testimony are both compensable so, although a more detailed invoice regarding those charges would have been helpful, a more detailed invoice for those expenses was not strictly speaking necessary. Dr. Talan's cancellation fees, however, are another matter. At the hearing on Southwestern's motion for taxed

costs, defense counsel justified taxing Dr. Talan's trial testimony cancellation fees on the ground that they were actual fees that Southwestern had to pay.[9] On appeal, Southwestern justifies the travel-time fees by explaining that travel is as necessary a part of testifying as is preparation and that nothing prevents a trial court from compensating experts for travel-time and expenses.

We agree that an expert witness's travel expenses are compensable. *Id*. But, as discussed, "costs," or "taxable costs," are not the equivalent of "expenses." *Guerrero*, 280 Mich App at 670. The presumption that costs shall be allowed as a matter of course to the prevailing party "does not mean . . . that every expense incurred by the prevailing party in connection with the proceeding may be recovered against the opposing party." *Beach*, 216 Mich App at 622 (quotation marks and citation omitted). "[T]he prevailing party cannot recover costs where there exists no statutory authority for awarding them." *Id*. at 621. The record before us fails to adequately establish a statutory basis for all of Dr. Talan's fees. As such, rather than make factual findings in the first instance we remand to the trial court "for an evidentiary hearing to further distinguish and recalculate those hours spent on taxable versus nontaxable costs." See *Van Elslander*, 297 Mich App at 219.[10]

For the foregoing reasons, we affirm, in general, the trial court's award of taxable costs to Southwestern. However, we reverse the trial court's specific order taxing costs related to Dr. Barson and remand for an evidentiary hearing to establish the basis for the trial court's order awarding Southwestern the costs for the expert witness fees of Drs. McGeorge and Talan.

## VI. DISBURSEMENT OF SETTLEMENT

On cross-appeal, Southwestern contends that the trial court erred by allowing plaintiffs' attorney to recover $192,096.61 in costs and fees from the Bronson settlement funds, and disbursing the remainder of the funds to the estate without first ordering the payment of Southwestern's taxable costs. We disagree.

## A. STANDARD OF REVIEW

This Court reviews for clear error a trial court's distribution of proceeds in a wrongful-death case. *Reed v Breton*, 279 Mich App 239, 241; 756 NW2d 89 (2009). Additionally, this Court reviews the interpretation of statutes and court rules de novo. *Id*. at 242.

---

[9] Southwestern used the same justification for taxing more than $26,000 in media expenses to prepare defense counsel's trial exhibits.

[10] We note that neither plaintiffs nor Southwestern addressed whether any statutory authority exists for Dr. Talan's "cancellation fees." We question whether any such statutory authority exists, but we decline to address the issue in the first instance. Nevertheless, on remand, such fees are an item which the trial court may review to determine whether there are both a legal and factual basis for imposing them.

B. ANALYSIS

1. SOUTHWESTERN'S ENTITLEMENT TO THE BRONSON SETTLEMENT FUNDS

Southwestern, a nonparty to the Bronson settlement, argues that it may recover its taxable costs from the settlement funds before the plaintiffs' attorney recovers his costs and fees. We disagree.

Southwestern bases its legal argument that it is entitled to a portion of the Bronson settlement funds on two cases, *Mason v Cass Co Bd of Co Rd Comm'rs*, 221 Mich App 1; 561 NW2d 402 (1997), and *Hill v LF Transp Inc*, 277 Mich App 500; 746 NW2d 118 (2008); defendants, for their part, do not dispute that these cases should guide our analysis.[11] We will discuss each case in turn, but first we find it necessary to note that a settlement between parties is not the result of a ruling on a motion and, therefore, is not a "verdict" subject to costs under MCR 2.403. *Webb v Holzheuer*, 259 Mich App 389, 392; 674 NW2d 395 (2003). Consequently, Southwestern's argument that its taxable costs may be paid from the Bronson settlement relies on the wrongful death act, MCL 600.2922, which provides, in relevant part:

> (6) In every action under this section, the court or jury may award damages as the court or jury shall consider fair and equitable, under all the circumstances including reasonable medical, hospital, funeral, and burial expenses for which the estate is liable; reasonable compensation for the pain and suffering, while conscious, undergone by the deceased during the period intervening between the time of the injury and death; and damages for the loss of financial support and the loss of the society and companionship of the deceased. The proceeds of a settlement or judgment in an action for damages for wrongful death shall be distributed as follows:

> * * *

> (d) After a hearing by the court, the court shall order payment from the proceeds of the reasonable medical, hospital, funeral, and burial expenses of the decedent for which the estate is liable. The proceeds shall not be applied to the payment of any other charges against the estate of the decedent. The court shall then enter an order distributing the proceeds to those persons designated in subsection (3) who suffered damages and to the estate of the deceased for compensation for conscious pain and suffering, if any, in the amount as the court or jury considers fair and equitable considering the relative damages sustained by each of the persons and the estate of the deceased. If there is a special verdict by a

---

[11] Southwestern also relies on *Bennett v Weitz*, 220 Mich App 295; 559 NW2d 354 (1996), for the proposition that Southwestern should have priority over plaintiffs' attorney regarding receiving funds from the Bronson settlement. We find it unnecessary to reach this issue, however, because, as explained in greater detail later, Southwestern is entitled only to a portion of the Bronson settlement proceeds, not funds directly from the settlement itself.

jury in the wrongful death action, damages shall be distributed as provided in the special verdict.

What we must now determine is whether Southwestern's taxable costs should be taken from the Bronson settlement or from that settlement's "proceeds." This distinction is important because the wrongful death act addresses the disbursement of a settlement's "proceeds," not the entirety of all funds received from a settlement. *Id*.

We begin by examining this Court's prior opinion in *Mason*. In *Mason*, the plaintiff's decedent was killed in a car accident and was the prevailing party following a jury trial. *Mason*, 221 Mich App at 3. The plaintiff, however, previously had rejected a mediation evaluation that was higher than the jury award and, as such, the trial court imposed mediation sanctions against the plaintiff to be paid from the jury verdict. *Id*. The plaintiff objected, arguing that the wrongful death act prevented the trial court from ordering the mediation sanctions to be paid from the jury verdict. *Id*. This Court began its analysis by examining the language of the wrongful death act, stating:

> In its first sentence, § 6 provides: "In every action under this section the court or jury may award damages as the court or jury shall consider fair and equitable, under all the circumstances . . . ." In its next sentence, § 6 provides for the distribution of "[t]he proceeds of a settlement or judgment." We conclude from the language and structure of this subsection that "[t]he proceeds" means an "award [of] damages as the court or jury shall consider fair and equitable, under all the circumstances." Further, "all the circumstances" surrounding an award of damages certainly includes the court rules and their provision for mediation as an important tool to promote settlements, using mediation sanctions to promote that end. Thus, when § 6(d) limits the purposes for which "the proceeds" are to be used, that limitation applies to the "award [of] damages" which, in an appropriate case, has already been reduced as a sanction for rejecting a mediation evaluation.

> Moreover, we conclude that this is the most "fair and equitable" approach, as contemplated by the statute. If defendants are required to seek the recovery of mediation sanctions from decedent's estate, they may well be able to make only partial, if any, recovery. Under § 6(d), most of the judgment amount will likely be used to pay medical, hospital, funeral, and burial expenses, along with payments to decedent's survivors for their pain and suffering, loss of companionship and support, or other damages they may have suffered. The estate will receive payment only to the extent that damages were awarded because of decedent's "conscious pain and suffering" before death. To the extent that defendants are unable to obtain full recovery of mediation sanctions from the estate, the penalty for rejecting the mediation evaluations is avoided. We will not "frustrate the intent behind the mediation sanctions rule . . . by giving estates immunity from the consequences of prosecuting meritless claims." *In re McDivitt Estate*, 169 Mich App 435, 440; 425 NW2d 575 (1988). [*Id*. at 5-6 (footnote omitted).]

The *Mason* Court then affirmed the trial court's order allowing the mediation sanctions to be paid from the jury's verdict before it was paid to the estate of the plaintiff's decedent. *Id*. at 6.

This Court extended the rule from *Mason* regarding mediation sanctions in *Hill*, concluding that a similar rationale applied to taxed costs. Unlike *Mason*, *Hill* dealt with taxed costs and the distribution of settlement funds. *Hill*, 277 Mich App at 502. In *Hill*, the plaintiff's decedent died in a car accident; one of the defendants, Auto-Owners, insured the vehicle the decedent was driving when that accident occurred. *Id*. at 502-504. Auto-Owners moved for summary disposition, arguing that the decedent already had coverage from a different insurer. *Id*. at 504. The trial court denied Auto-Owners' motion and the case proceeded to arbitration; the plaintiff received a favorable arbitration award and Auto-Owners appealed following that award. *Id*. On appeal, this Court concluded that the trial court erred by denying Auto-Owners' motion for summary disposition. The trial court eventually taxed costs and ordered plaintiff to pay the taxed costs "from any available property of the Estate as that property becomes available to fund such payment." *Id*. at 505 (quotation marks and citation omitted).

The plaintiff then filed a new wrongful death lawsuit, to which Auto-Owners was not a party, and received a monetary judgment following case evaluation and a settlement with the defendants in that case. *Id*. at 506. Auto-Owners moved to intervene and sought payment of its taxed costs from this new award. *Id*. The trial court denied Auto-Owners' motion to intervene, which Auto-Owners appealed. *Id*. at 506-507. The *Hill* Court concluded that the trial court erred by denying Auto-Owners' motion to intervene and then turned to the wrongful death act to determine whether Auto-Owners was entitled to any of the new award. *Id*. at 508-509. The *Hill* Court summarized *Mason* before holding that

> While this case involves costs taxed by the prevailing party in an appeal, and not the recovery of mediation sanctions, we see no basis to distinguish between the two. Part of the analysis in *Mason* was a refusal to frustrate the intent behind mediation sanctions by effectively giving estates immunity from sanctions where there are little assets in an estate. Although an award of costs to the prevailing party in an appeal does not serve the same purpose as mediation sanctions, it serves a similar purpose. And just as there is no purpose to allowing estates to escape mediation sanctions, there is no valid purpose to allowing estates the ability to escape an award of costs to the prevailing party. Accordingly, consistent with this Court's decision in *Mason*, we hold that the proceeds of a wrongful death action are determined after the reduction for an award of costs in litigation arising from the wrongful death just as the award may be reduced for mediation sanctions under *Mason*. [*Id*. at 509-510 (citations omitted).]

Consequently, the *Hill* Court concluded that Auto-Owners was entitled to recover its taxable costs from the plaintiff's new award because that award "involve[d] the same essential claim"—i.e., which party, if any, was liable for the decedent's death—as the claim at issue when Auto-Owners was a named defendant. *Id*. at 510-511. Accordingly, Auto-Owners could tax its costs from the plaintiff's award before that award was distributed to the decedent's estate. *Id*.

When viewed together, *Mason* and *Hill* establish that mediation sanctions and taxed costs may be removed from a settlement or judgment before its "proceeds" are paid to an estate under the wrongful death act. *Mason* held that a "fair and equitable" approach should be used when deciding whether sanctions should be taken from a settlement or judgment before its "proceeds" are paid to an estate under the wrongful death act. *Mason*, 221 Mich App at 5-6. *Hill* then held

that *Mason*'s rationale applied to taxed costs because, just as with mediation sanctions, "there is no valid purpose to allowing estates the ability to escape an award of costs to the prevailing party." *Hill*, 277 Mich App at 510. Consequently, "consistent with this Court's decision in *Mason*," the *Hill* Court held "that the proceeds of a wrongful death action are determined after the reduction for an award of costs in litigation arising from the wrongful death just as the award may be reduced for mediation sanctions under *Mason*." *Id*. The *Hill* Court did not explicitly address *Mason*'s "fair and equitable" framework for determining when an award should be reduced due to sanctions, but *Hill* explicitly referenced *Mason*'s reasoning and stated that the same rule established in *Mason* for mediation sanctions applied to taxed costs. *Id*. Thus, a trial court may tax costs from a settlement or judgment before the proceeds are distributed to an estate under the wrongful death act only when it would be "fair and equitable" to do so. *Id*.; *Mason*, 221 Mich App at 5-6.

Here, the trial court concluded that it would not be appropriate to tax Southwestern's costs before distributing the Bronson settlement to Kinzie's estate. The trial court's decision certainly creates the possibility that Kinzie's estate may escape the award of costs to Southwestern and, therefore, conflicts with our general public policy preference that prevailing parties have an opportunity to collect sanctions and taxed costs. But that general policy preference is not an absolute rule. Indeed, if it was an absolute rule then there would be no need for a "fair and equitable" approach when determining whether costs or sanctions should be taken from a settlement or judgment before those proceeds are paid to an estate.

In ruling on Southwestern's motion to tax costs directly from the Bronson settlement rather than its proceeds, the trial court did not explicitly reference *Mason* or its "fair and equitable" approach. But the trial court clearly balanced the equities and thoughtfully considered the impact its ruling would have on the Bronson settlement. The trial court did not want the Bronson settlement "to be ultimately undone" by allowing Southwestern to tax costs from it before distributing any of those funds to Kinzie's estate. In doing so, the trial court essentially balanced Michigan's public policy preference favoring settlements and the idea that Southwestern's course of action could have the effect of disincentivizing future settlements against the competing public policy preference that prevailing parties be able to tax costs. The trial court's order placed a higher value on settlements than on Southwestern's ability to fully recover its taxed costs, concluding that this was the most "fair and equitable" outcome. We are not definitely and firmly convinced that it erred by doing so. As such, we affirm the trial court's order requiring Southwestern to tax its costs from the Bronson settlement's proceeds after the proceeds were paid to Kinzie's estate.

## 2. ATTORNEY FEES OF PLAINTIFFS' ATTORNEY

Lastly, Southwestern nonetheless urges this Court to reverse the trial court's order and remand the matter for an evidentiary hearing to determine the basis and reasonableness of plaintiffs' attorney costs and fees. Southwestern has failed to provide any legal authority entitling it to this relief.

"[T]he recovery of costs advanced by an attorney to a client under a fee agreement is governed by contract law." *Estate of Kalisek by Kalisek v Durfee*, 322 Mich App 142, 149; 910 NW2d 717 (2017). Likewise, contract law also guides "a trial court's authorization of the distribution of proceeds from a successful wrongful-death suit in regard to costs incurred by the plaintiff's counsel." *Id*. As already discussed, the trial court accepted the plaintiffs' attorney's

costs as "in the ballpark in terms of the expenses that would have been incurred" during the five years before the settlement. The trial court also accepted the plaintiffs' attorney's representation that those costs were advanced as part of the Estate's action against Bronson. Further, plaintiffs agreed on the record that they understood that their attorney would deduct his firm's costs and attorney fees from the gross amount of the settlement and that the net amount would go to the Estate to be distributed. The trial court having determined that the costs and fees were reasonable, necessary, and incurred, and there being no complaint about the fee agreement from plaintiffs, the trial court did not err by disbursing the Bronson settlement funds according to the fee agreement. Southwestern contends that the trial court did not make a record sufficient for appellate review. To the contrary, the record is sufficient because neither the parties to the Bronson settlement agreement nor the parties to the fee agreement have asked this Court to review either. Finally, Southwestern has not cited any legal authority for the proposition that it may inject itself into the contractual relationship between plaintiffs and their attorney. As such, the argument is abandoned and we decline to address it further. See *Cheesman*, 311 Mich App at 161.

## VII. CONCLUSION

Plaintiffs have failed to establish a *Batson* violation, a violation of MRE 408, or that defense counsel made prejudicial statements revealing a deliberate attempt to inflame or otherwise prejudice the jury. Therefore, we affirm the trial court's order entering a judgment of no cause of action and its order denying plaintiffs' motion for a new trial. Given our affirmance of these two orders, we need not address other issues the parties raised that were contingent on our vacating the jury's verdict and remanding for a new trial. We affirm in part and reverse in part the trial court's order granting Southwestern's motion for taxed costs, and remand for further proceedings consistent with this opinion. As for Southwestern's cross-appeal, we affirm the trial court's order granting plaintiffs' motion to approve payment of costs.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Jonathan Tukel
/s/ Kirsten Frank Kelly
/s/ Michael F. Gadola

-21-